UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER S. NELSON, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:11-cv-0588-SEB-TAB |
| | ) | |
| NORTHWESTERN MUTUAL LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ADDRESSING PENDING MOTIONS

This lawsuit concerns the legal interpretation of a life insurance policy issued by

Defendant, Northwestern Mutual Life Insurance Company ("NML"), to Plaintiff,

Christopher S. Nelson, M.D. ("Dr. Nelson").   Three motions are presently before the

Court:   (1) Plaintiff's Motion for Partial Summary Judgment [Docket No. 19], filed

September 6, 2011; (2) Defendant's Motion to Strike Plaintiff's Designated Expert Reports

and Affidavits [Docket No. 26], filed October 27, 2011 ("the Motion to Strike"); and (3)

Defendant's Cross-Motion for Summary Judgment [Docket No. 27], filed October 27,

2011.   All of the motions are fully briefed, and the Court is properly advised in the matter.

Accordingly, the Court DENIES Plaintiff's Motion for Partial Summary Judgment,

DENIES Defendant's Motion to Strike, and GRANTS Defendant's Cross-Motion for

Summary Judgment.

## I.  Factual Background

**A.   Dr. Nelson's Relevant Professional and Personal History**

Dr. Nelson is a citizen of the State of Indiana and a 1998 graduate of the Indiana University School of Medicine.   Compl. ¶ 1; Pl.'s Br. at 2.   After completing his medical education, a postgraduate internship, and a residency program, he began his career in anesthesiology.   He served as staff anesthesiologist at Goshen General Hospital between 2002 and 2003, at Great Lakes Anesthesia between 2003 and 2004, and, beginning in 2004,[1] at Unity Arts Surgery Center ("the Surgery Center").   Dr. Nelson's chief duty in this capacity was to administer anesthesia to patients before, during, and after surgeries. *See* Pl.'s Br. at 2.   He earned in excess of $200,000 annually during his first two years in practice.   *Id.* at 8.   As of 2005, his role at the Surgery Center had expanded to include Director of Anesthesia, primary anesthesiologist, and minority shareholder; he earned approximately $229,594 that year.   *Id.* at 2-3, 8.

Regrettably, Dr. Nelson's relationship with narcotics crossed the line from professional to personal in January 2006, when he began abusing opiates that had been prescribed to his mother.[2]   Pl.'s Ex. 1 ("Nelson Aff.") ¶ 5.   He depleted his mother's cache of Vicodin three months later and subsequently obtained narcotics from other family members without their knowledge.   When these relatives ultimately confronted Dr. Nelson, he started diverting property of the Surgery Center for personal use.   Between May and August of that year, he abused Demerol and Fentanyl from the Surgery Center,

---

[1]In 2004, Dr. Nelson also obtained certification from the American Board of Anesthesia. Pl.'s Resp. at 2.

[2]Dr. Nelson's mother, who suffered from chronic medical conditions, died prior to January 2006.   Nelson Aff. ¶ 5.

self-administering the drugs through intramuscular and intravenous injections.   *Id.*   Dr.

Nelson's alleged "attempt[s] to quit using narcotics during the weekends" during this time

period were evidently unsuccessful; "invariably[, he] began using immediately upon his

return to work."   Pl.'s Br. at 3.

On August 20, 2006, Dr. Nelson sought professional help for drug addiction and

was referred to the Indiana State Medical Association's Physician Assistance Program

("the ISMA Program").   Pl.'s Br. at 3; Nelson Aff. ¶ 6.   Dr. Nelson entered a

twelve-week intensive outpatient addictions program at Rush Behavioral Health on August

24 and was discharged following successful completion of the program in November

2006.[3]   Nelson Aff. ¶ 7.   He obtained part-time employment as an anesthesiologist in

December 2006 and worked in that capacity "[up] to March[] 2007."   *Id.* ¶ 8.   Hoping to

return to the full-time practice of medicine in St. Joseph, Michigan, Dr. Nelson began

applying for a Michigan medical license in March 2007.   *Id.* ¶ 9.   He enrolled in the State

of Michigan's health professionals monitoring program in June 2007 and received an

unrestricted license to practice.   *Id.* ¶ 9.   Around the same time, he began working for

Sunset Coast Anesthesia ("Sunset Coast"), which he describes as "a very high stress/high

volume environment with unlimited access to narcotics," and obtained staff privileges at

St. Joseph Regional Hospital.   *Id.*

Only four weeks into his employment with Sunset Coast, Dr. Nelson "experienced

_____

[3]Given Dr. Nelson's allegations concerning his employment history between December
2006 and March 2007, *see* Nelson Aff. ¶ 8, as well as his own assertion that he completed
treatment in 2006, we presume that the reference to "discharge[] in 2007," *see* Pl.'s Br. at 3, was
incorrect.

many overpowering triggers in the operating room" that proved too strong for him to resist. Pl.'s Br. at 4.   He again began misappropriating the facility's Demerol for personal intravenous use, which "led to [his] privileges being suspended."   Nelson Aff. ¶ 10.   Dr. Nelson returned to Rush Behavioral Health in August 2007 for further inpatient treatment, but his stay ended the following month due to family and financial difficulties.   He "voluntarily signed [a contract] with Rush agreeing not to practice medicine . . . in any form or capacity" for one year.   *Id.* ¶ 13.   Despite the completion of a partial inpatient program at South Bend, Indiana's Madison Center between September and December 2007, Dr. Nelson began abusing Vicodin and alcohol shortly thereafter.   He resumed treatment at Madison Center in January 2008 and completed an "aftercare program" in May of that year.   *Id.* ¶¶ 16-17.   Nevertheless, the Michigan Board of Medicine suspended Dr. Nelson's Michigan medical license for six months in October 2007; the Indiana Medical Licensing Board ("the Indiana Board") took similar action against him on April 27, 2009.   *Id.* ¶ 19; Pl.'s Br. at 6-7.

The suspension of Dr. Nelson's Indiana medical license was for an "indefinite" period, and the Indiana Board considered his petition for reinstatement on December 3, 2009.   *See* Pl.'s Br. at 7; Pl.'s Ex. 3-C ("Prob. Lic.") at 1.   By order stating its findings of fact and conclusions of law, the Indiana Board voted 6-0-0 to issue Dr. Nelson a probationary medical license on December 17, 2009.   *Id.* at 1-2.   One of the Indiana Board's conclusions of law was that Dr. Nelson had "establish[ed] that he [was] able to practice with reasonable skill and safety to the public."   *Id.* at 2.   Dr. Nelson's

reinstatement was subject to several conditions:   (1) complying with his ISMA Program contract and reporting on his progress; (2) abstaining from the practice of anesthesiology; (3) working under physician supervision; (4) working in "a corrections employment setting;" (5) complying with the terms of his Michigan probation; (6) paying transcript costs in his reinstatement proceeding; and (7) complying with all laws governing the practice of medicine.   *Id.* at 2-3.

Dr. Nelson sought employment in the corrections setting soon after his reinstatement.   In late 2009, he approached Dr. Michael Mitcheff,[4] the Statewide Medical Director of the Indiana Department of Correction ("IDOC") and the Regional Medical Director of Correctional Medical Services ("CMS"), to discuss joining CMS as a primary care physician.   Pl.'s Br. at 8.   It was Dr. Mitcheff's professional judgment that "Dr. Nelson was not competent to serve as a primary care physician with CMS based upon his education, training or experience" at that time.   Pl.'s Ex. 5 ("Mitcheff Aff.") ¶ 3.   Thus, before extending an offer of employment, CMS required Dr. Nelson to complete "approximately 100 hours of continuing medical education in subject matters related to primary care" and spend several weeks "shadowing" in one of Indiana's correctional facilities.   *Id.* ¶ 4.   CMS officially retained Dr. Nelson as a staff physician on January 1, 2010, placing him "under direct supervision" by Dr. Michael Person for the first six months and "under weekly supervision" thereafter.   *Id.* ¶¶ 5-6 (noting that Dr. Nelson's

---

[4]Dr. Mitcheff testified at the hearing before the Indiana Board regarding reinstatement of Dr. Nelson's Indiana medical license.   *See* Lic. Mod. at 2.

training would "continue indefinitely").   As of September 6, 2011 (the filing date of Plaintiff's Brief in Support of the Motion for Summary Judgment), Dr. Nelson's annual income was approximately $185,000.   Pl.'s Br. at 8.

The Indiana Board reviewed its order granting Dr. Nelson's probationary license in early 2010 to ensure compliance with credentialing standards for two governing correctional health care associations.   Pl.'s Ex. 3 Attach. D ("Lic. Mod.") at 1-2.   On February 4, 2010, the Indiana Board issued a ruling modifying its December 17, 2009 order as follows:   "Paragraph 3(d) of [Dr. Nelson's] probation is modified to read . . . . Any change in Dr. Nelson's employment, occupation or duties[,] as described by Dr. Michael Mitcheff at the December 3, 2009 hearing, must be approved by the Board."   *Id.* at 2.   All other terms and conditions of Dr. Nelson's probationary license remained unchanged and, to the Court's knowledge, remain in full effect.

### B.   The Northwestern Mutual Life Insurance Policies

On June 4, 2003, NML[5]  issued a term life insurance policy to Dr. Nelson.   Policy Number 16 447 735 ("the Term Policy"), a "select (non-tobacco use) premium class" plan, insured Dr. Nelson's life for $3,000,000.   Def.'s Ex. 1 (Term Pol.) at 3.   Dr. Nelson was listed as both "Owner" and "Insured" on the Term Policy; his wife, Jennifer Nelson, was the "Direct Beneficiary."   *Id.*   For the year 2003, when Dr. Nelson was 34 years old, the total scheduled premium amount for the Term Policy was $1,700.   *Id.*   Premiums were to

---

[5]NML is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.   Compl. ¶ 2.

increase throughout the term, which ran to Dr. Nelson's seventy-fifth birthday.   *Id.*   Dr.

Nelson had the option to convert the Term Policy to a new policy on or before June 4,

2029[6] without providing proof of insurability.   *Id.* at 7-8.

The Term Policy contained a Waiver of Premium Benefit providing:   "If total

disability of the Insured starts on or before the policy anniversary nearest his 60th birthday,

[NML] will waive all premiums that come due on the policy as long as the total disability

continues."   Term Pol. at 13.   NML defined "total disability" under the Term Policy as

follows:

> A total disability is one which prevents the Insured from engaging in an occupation.
> For the first 24 months of total disability, an occupation is the one that the Insured
> had at the time he became disabled.   After 24 months, an occupation is one for
> which the Insured is qualified by education, training or experience.   Due regard
> will be given to his vocation and earnings before he became disabled.

*Id.*   According to the Term Policy, premiums could be waived for total disability "only if:

the Insured becomes disabled while this Benefit is in force; the disability results from an

accident or sickness; and the disability lasts for at least six months."   *Id.*   Eligibility for

this benefit required proof of total disability within one year of total disability onset.

Additionally, the Term Policy provided:   "Proof that the total disability has continued may

be required once a year.   If the proof is not given when it is required, no more premiums

will be waived."   *Id.*

In early 2008, on the advice of his NML insurance agent,[7] Dr. Nelson exercised his

---

[6]June 4, 2029 was the final conversion date listed on the Term Policy.   Term Pol. at 3.
[7]Dr. Nelson alleges that "[t]he NML agent was fully aware of [Dr. Nelson's] disease and

option to convert the Term Policy into a flexible premium adjustable life insurance policy "due to the waiver of premium clause."   Nelson Aff. ¶ 21; Def.'s Br. at 2.   Policy Number 18 296 274 ("the Second Policy"), a "premier (non-tobacco)" plan, had an official issue date of July 7, 2008 and also insured Dr. Nelson's life for $3,000,000.   Def.'s Ex. 2 (Flex. Pol.) at 3.   The Second Policy required premium payments at the rate of $3,672.50 per month ("the Selected Monthly Premium").   *Id.*   In the event that Dr. Nelson surrendered the Second Policy for cash, NML would determine the cash surrender value using a guaranteed interest rate of 4% during the first fifteen years of the Second Policy and 3% thereafter.

Pursuant to the terms of the Second Policy, as before, Dr. Nelson could exercise a waiver benefit.   The Second Policy's version of this benefit ("Waiver Benefit:   Payment of Selected Monthly Premium Upon Total Disability," hereafter "the Waiver Benefit") provided that:

> If total disability of the Insured starts on or before the [Second] Policy anniversary nearest the 60th birthday of the Insured, on each monthly processing date following approval of a claim [NML] will credit to [the Second] Policy for as long as the total disability continues the Selected Monthly Premium Benefit, which shall be the greater of:
> a.   the Selected Monthly Premium amount . . . ; and
> b.   a premium in an amount that, after deducting the Premium Expense Charge, will equal the Specified Monthly Charges.   The Specified Monthly Charges shall consist of the Monthly Policy Charge for this Policy, excluding the Monthly Policy Debt Expense Charge.

Flex. Pol. at 23.   In the Second Policy, NML defined "total disability" as follows:

---

treatments at the time he suggested converting the policy."   Nelson Aff. ¶ 21.

8

A total disability is one which prevents the Insured from engaging in an occupation. For the first 24 months of total disability, an occupation is the one that the Insured had at the time the Insured becomes disabled.   After 24 months, an occupation is one for which the Insured is qualified by education, training or experience.

*Id.*

The Second Policy limited the Waiver Benefit by clarifying that the Selected Monthly Premium Benefit would be payable "only if:   the Insured becomes totally disabled while this Waiver Benefit is in force; the total disability results from an accident or sickness; and the total disability lasts for at least six consecutive months."   *Id.* Provisions governing proof of total disability and continuing disability were substantially similar to those contained in the Term Policy.   *See id.* at 24.

Dr. Nelson's onset date of total disability was July 11, 2007; therefore, the first 24-month period of total disability concluded July 11, 2009.   Pl.'s Ex. C ("NML Ltr.") at 1.   Pursuant to the Term Policy, NML paid Dr. Nelson's premiums beginning July 11, 2007.   Nelson Aff. ¶ 21.   After Dr. Nelson converted the Term Policy to the Second Policy, NML honored the Waiver Benefit and paid his premiums through the first 24-month period of total disability.   NML Ltr. at 1.   NML "continued the Waiver Benefit as an exception in December 2009, even though [NML] did not receive proof of an ongoing total disability."   *Id.*   At some point in 2010, Dr. Nelson requested a continuance of the Waiver Benefit and submitted various documents to support his claim.   Following a thorough review of all claim documentation, NML notified Dr. Nelson of its decision to terminate the Waiver Benefit by letter dated December 20, 2010.   *Id.*   NML informed Dr.

Nelson that "there [was] insufficient proof to support that due to a total disability, Dr. Nelson [could not engage] in an occupation for which he is qualified by education, training or experience[,] as he has returned to work as a primary care physician." *Id.* at 2. Dr. Nelson has sued NML in this breach of contract action in an effort to challenge the lawfulness of this determination.

<u>**Legal Analysis**</u>

## I.  Standard of Review

The interpretation of written contracts such as insurance policies is typically a matter of law. Accordingly, disputes arising under the terms of such agreements are particularly appropriate for resolution by summary judgment. *See Hurst-Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995). Summary judgment is warranted when the record demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the same. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Courts are often confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow plaintiffs and defendants to move for such relief. In these circumstances, courts must consider the motion of each party individually to determine if the party has satisfied the Rule 56 standard. *Am. Gen.*

*Life Ins. Co. v. Tomlinson Ins. Trust*, No. 1:08-cv-1747-SEB-TAB, 2010 WL 3893673, at

*3 (S.D. Ind. Sept. 30, 2010) (citing *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475,

478 (D. Md. 1998)).   Thus, our review of the record before us requires us to draw all

inferences in favor of the party against whom a particular issue in the motion under

consideration is asserted.   *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing

Club*, 293 F.3d 402, 404 (7th Cir. 2002); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d

685, 692 (7th Cir. 1998).

Because this is a diversity case, we look to state law to provide substantive guidance

regarding the relevant insurance policies.   *McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d

583, 586 (7th Cir. 1998).   "The operative rule is that when neither party raises a conflict of

law issue in a diversity case, the federal court simply applies the law of the state in which

the federal court sits."   *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

Here, because the relevant policy has no choice of law provision and the parties do not

dispute that Indiana law controls, the Court need not discuss whether another forum's law

should be applied.   *See id.*

Under Indiana law, insurance contract provisions are susceptible to the same rules

of construction as other contracts.   *Am. Family Mut. Ins. Co. v. Ginther*, 843 N.E.2d 575,

578 (Ind. Ct. App. 2006).   Courts must therefore construe insurance policies as a whole

and must not consider words, phrases, or paragraphs in isolation.   *Westfield Cos. v.

Knapp*, 804 N.E.2d 1270, 1274 (Ind. Ct. App. 2004).   Policy language that is clear and

unambiguous should be given its plain and ordinary meaning.   *Id.*   Insurance companies

are also "free to limit their liability, so long as they do so in a manner consistent with public policy as reflected by case or statutory law."  *Gheae v. Founders Ins. Co.*, 854 N.E.2d 419, 423 (Ind. Ct. App. 2006).   Consequently, "[a]n insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability." *Haag v. Castro*, 959 N.E.2d 819, 824 (Ind. 2012).   Terms in such a policy are given their ordinary and common meaning unless the policy indicates that the parties intended some other connotation.  *See Westfield Cos.*, 804 N.E.2d at 1274.   However, when terms limiting coverage are "not clearly and plainly expressed," the policy should be construed in favor of the insured "to further the policy's basic purpose of indemnity."  *Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 698 N.E.2d 770, 773 (Ind. 1998).

## II.  Discussion

We first note NML's request that the Court strike from the record four affidavits filed by Dr. Paul Calkins ("Calkins Aff."), Dr. Michael Mitcheff ("Mitcheff Aff."), Joseph Gordon ("Gordon Aff."), and Joseph Zacharias ("Zacharias Aff."), respectively, in support of Plaintiff's Motion for Partial Summary Judgment.   As a preliminary matter, we DENY AS MOOT Defendant's Motion to Strike with respect to Dr. Mitcheff's affidavit.   NML's original objection to the Mitcheff Affidavit was that it was not signed.   In our view, Dr. Nelson's subsequent submission of a signed affidavit (and NML's apparent acceptance of the same in its reply brief) obviates the need for further analysis.   We therefore accept the Mitcheff Affidavit as part of the evidentiary record and address the remaining affidavits in the latter part of this entry.

Dr. Nelson moved for partial summary judgment on the issue of liability on September 6, 2011.   NML responded and filed its own motion for summary judgment on October 27, 2011, "seeking to have [Dr.] Nelson's allegations of breach and repudiation dismissed."   Def.'s Br. at 5.   Both motions necessarily focus on the proper determination of disability under the occupational disability policies issued in Indiana.   As noted above, the Second Policy's definition of "total disability" is "one which prevents the Insured from engaging in an occupation."   Flex. Pol. at 23.   And the meaning of the term "occupation" is time-dependent; for the first 24 months following disability onset, it means "the one that the Insured had at the time."   *Id.*   Dr. Nelson's occupation on July 11, 2007 (the date of disability onset) can be found in his application for life insurance:   "[a]nesthesiologist, MD."   Term Pol. App. at 5.   Beginning July 11, 2009, however, "an occupation is one for which the Insured is qualified by education, training or experience."   Flex. Pol. at 23.

Dr. Nelson first contends that he is totally disabled due to "chemical dependency." He further alleges that such dependency "creates a risk of death[,] rendering him unable to practice anesthesiology" or any medical discipline which exposes him to the operating room, surgeries, and/or "frequent exposure to needles and alcohol swabs."   Pl.'s Br. at 19. As an initial point of clarification, we do not view Dr. Nelson's risk of drug and/or alcohol relapse a "sickness" under the Second Policy.   The Second Policy cannot reasonably be construed as providing coverage for the future potentiality of sickness; rather, it unambiguously covers a presently existing "sickness."   *See Forste v. Paul Revere Life & Acc. Ins. Co.*, No. 1:02-cv-1584-RLY-TAB, 2004 WL 3315386, at *12 (S.D. Ind. Sept. 22,

13

2004).   Importantly, as Dr. Nelson's own proffered expert has implied, discussing his

chemical dependency is a hypothetical exercise.   Dr. Nelson is *not* presently abusing

drugs, nor is he practicing medicine in an environment replete with the "known triggers" of

relapse.   *See* Pl.'s Ex. 2 (Hinchman Aff.) at 4.   Our only task, therefore, is to determine

Dr. Nelson's disability status with his presently existing "sickness," *i.e.*, past opiate use,

family history of chemical dependency, and lower tolerance for stress.   *Id.* at 4.   This we

do with an eye toward his current employment as a CMS staff physician.

   "[I]t is undisputed [that] Dr. Nelson's severe chemical dependency removed him

from anesthesia . . . by his treating physicians and licensing boards."   Pl.'s Br. at 14.

Since his treatment and reinstatement, and with the Indiana Board's specific finding that he

was "able to practice with reasonable skill and safety to the public,"[8] Dr. Nelson has

worked as a primary care physician for nearly three years.   Prob. Lic. at 1 (relying on

testimony of Dr. Fred Frick of the ISMA Program).   For purposes of summary judgment,

the applicable "total disability" inquiry is whether Dr. Nelson's current employment

represents work for which he is "qualified by education, training or experience."

   Indiana law supports construction of "total disability" in favor of the insured.   To

that end, in *Ross v. Farmers Insurance Exchange*, 277 N.E.2d 29, 34 (Ind. Ct. App. 1971),

the Indiana Court of Appeals held that total disability "does not mean a state of utter

helplessness . . . [or] that [courts] are allowed to rewrite the provisions under which the

---

[8]The Indiana Board qualified this statement by noting that Dr. Nelson could practice in this manner, provided that he had adequate monitoring and did not practice anesthesiology.   Prob. Lic. at 1.

parties contracted."   The *Ross* court also noted the distinction between "occupational" and "general" disability in the context of insurance policies:

> If the policy is of the 'occupational' type and undertakes to insure against disability to transact a certain business or to perform labor in a particular occupation in which the insured is engaged, the insured is ['totally disabled'] within the meaning of the policy if the infirmity resulting from the accidental injury is such as to render the insured unable to do all the substantial and material acts necessary to the . . . carrying on of his occupation . . . were it not for the disability.
>
> If the policy is of the 'general' type and undertakes to insure against loss only in case the insured shall become . . . 'totally disabled,' and there are no words limiting the disability to a particular business or occupation, the insured becomes . . . 'totally' disabled, within the meaning of the policy, if the infirmity occasioned by the accident in fact renders the insured unable to carry on any business, or remunerative vocation, which business or vocation the insured would be qualified, physically and mentally, to carry on if it were not for such infirmity.

*Ross*, 277 N.E.2d at 32 (citations omitted).

A decade later, in *Continental Casualty Co. v. Novy*, 437 N.E.2d 1338 (Ind. Ct. App. 1982), the Indiana Court of Appeals addressed the foregoing distinction in circumstances similar to those in the case at bar.   *Novy* involved a general practice physician with radiodermatitis (a skin condition triggered by overexposure to x-rays) who had purchased insurance coverage for both "occupational" and "general" disability.   *Novy*, 437 N.E.2d at 1340-41.   As Dr. Novy's condition worsened, he developed ulcers on his hands that required skin grafts and eventually the amputation of two fingers.   He received disability benefits while recovering from these procedures, but his benefits ceased when he reopened his practice to wind down the business and refer patients elsewhere.   *Id.* at 1341.   While his lawsuit against Continental Casualty was pending, Dr. Novy began working as a staff

physician at a VA hospital.   This position authorized him to examine, diagnose, and treat patients, but not to conduct any surgeries.   Following a bench trial, the trial court awarded Dr. Novy $1200 per month in disability benefits dating back approximately to the time of his amputations.   *Id.* at 1341-42.   The trial court opined that because Dr. Novy could not exercise the degree of skill possessed by similarly situated general practice physicians for the 60-month period specified in the policy, he was "occupationally disabled" during that time.   *Id.* at 1346.   Moreover, the trial court concluded, Dr. Novy was "generally disabled" following that 60-month period because, in his staff physician job, he was not "engag[ed] in each and every occupation or employment for wage or profit for which he [was] reasonably qualified by reason of education, training, or experience."   *Id.* at 1352.

Among other issues on appeal was Continental Casualty's challenge to the trial court's determination of Dr. Novy's disability status.   Given that Dr. Novy had secured a position at the VA hospital that required his medical knowledge and skill, Continental Casualty argued that the doctor was neither occupationally nor generally disabled.   *Novy*, 437 N.E.2d at 1350.   The appellate court rejected the insurer's former argument, holding that "the trial court reasonably concluded that Novy sought . . . to protect himself against the loss of his [former] general practice."   *Id.* at 1351.   However, on the issue of general disability, the appellate court took a different view, to wit:

> The general disability provision encompasses more than a disability in a particular occupation . . . .   [Dr.] Novy would be entitled to benefits [for general disability] if he were unable to pursue any gainful employment for which he was "qualified by reason of education, training or experience."   [Dr.] Novy, however, was employed as staff physician at the V.A. Hospital . . . .   While we recognize that [Dr.] Novy

16

> was no longer pursuing his occupation as a general practitioner, he was employed in
> his capacity as a licensed physician . . . . Therefore, we hold that a doctor of
> medicine is employed for wage or profit for which he is reasonably qualified by
> reason of education, training or experience when he works full time as a staff
> physician at a V.A. Hospital.

*Id.* at 1351-52.   The appellate court therefore (1) upheld the trial court's finding that Dr.

Novy was occupationally disabled; (2) reversed the trial court's finding that he was

generally disabled; and (3) reduced the trial court's award of disability benefits.

Applying these principles to Dr. Nelson's situation (and noting no other case law as

germane to the instant lawsuit as *Ross* and *Novy*) simplifies the Court's decision.   Indeed,

well before these decisions issued, the Seventh Circuit made a similar ruling concerning

general disability policies:

> We think it is now well settled under the laws of Indiana that total disability . . . does
> not mean absolute physical inability or complete helplessness to transact any kind of
> business. *The test is whether the condition of the insured is such as to prevent him
> from transacting all kinds of work pertaining to his . . . profession.*

*Mut. Life Ins. Co. of N.Y. v. Tormohlen*, 118 F.2d 163, 166 (7th Cir. 1941) (applying

Indiana law) (emphasis added).   Here, none of the parties' proffered evidence indicates

the existence of a genuine issue of material fact regarding Indiana's "test."   By his own

admission, Dr. Nelson has completed four years of medical school and four years of

postgraduate medical education.   He has necessarily passed numerous qualifying exams

in order to become a licensed and board-certified anesthesiologist.   Presumably, a

showing of inferior general medical knowledge at any point in this process would have

thwarted his career trajectory.   We are therefore not persuaded that completing additional

17

training for employment at CMS rendered Dr. Nelson generally disabled under the Second

Policy.   Professionals such as physicians (and attorneys) are routinely required to

complete continuing education to maintain licensure.   In fact, we suspect Dr. Nelson

might have needed to "brush up" on generalist training in 2010 (when Dr. Mitcheff

officially hired him at CMS) regardless of his career status.   The Indiana Board's

December 2009 finding that Dr. Nelson could practice medicine "with reasonable skill and

safety to the public" corroborates our opinion, as does Dr. Hinchman's assertion that Dr.

Nelson could practice medicine 40 hours per week in a structured environment.   Thus, in

our view, Dr. Nelson's specialty change does not rise to the level of general disability.[9]

Although the facts readily support the conclusion that Dr. Nelson is no longer

entitled to disability benefits, Dr. Nelson contends that the Court must engage in a detailed

comparison of his current salary to that which he *might have* earned had he (1) remained an

anesthesiologist, (2) retained his position as Director of Anesthesia, and (3) abstained from

narcotics.[10]   Relying on several state cases that are not binding on this court, Dr. Nelson

asserts that "income which can be derived from another occupation is an important

consideration in determining whether [he] is disabled."   Pl.'s Br. at 15.   NML rejoins that

such an argument likens the Second Policy to "income insurance" and, to that end, has

---

[9]The facts adduced by the parties indicate that Dr. Nelson can practice general medicine without risking his life and health.   Because of this, and because we have determined that Dr. Nelson's ability to do so at CMS does not render him generally disabled, we need not address Dr. Nelson's reliance on the so-called "relapse rule" articulated in *Prudential Insurance Co. v. Girton*, 12 N.E.2d 379 (Ind. Ct. App. 1938).   Such reliance is, in the Court's reasoned judgment, inapposite.

[10]The confluence of these factors is, to say the least, extremely hypothetical.

18

asked the Court to strike the Calkins, Gordon, and Zacharias Affidavits (all of which discuss income considerations) from the evidentiary record.

NML cites Rules 56(c) and 56(e) of the Federal Rules of Civil Procedure as the bases for its objections to these affidavits, deeming the substance therein "speculative opinions that are irrelevant, not germane, and immaterial to [the] Court's analysis" at the summary judgment stage. Def.'s Mot. at 1. Rule 56(c) states, in pertinent part, that affidavits filed in support of a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1)(4). If a party fails to meet this burden, Rule 56(e) gives the court wide discretion to: "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed . . .; (3) grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e). The Court is satisfied that, based on personal knowledge, these declarants are competent to testify (albeit very generally) on anesthesiologists' average yearly earnings. The remaining issue, therefore, is whether their testimony has any tendency to make Dr. Nelson's ability to engage in an "occupation" (as defined by the Second Policy) more or less probable. If it does, it is relevant and should not be stricken; if it does not, it is irrelevant and inadmissible. *See* Fed. R. Evid. 401-02.

As NML correctly observes, no courts interpreting Indiana law have relied upon income comparisons when determining the disability status of an insured. Moreover,

"[t]he Seventh Circuit has not directly considered the scope of the factors relevant to the termination of benefits under [a general] definition of disability."   *Schaub v. Consol. Freightways, Inc. Extended Sick Pay Plan*, 895 F. Supp. 1136, 1144 (S.D. Ind. 1995).   We are not obligated to follow non-binding authority on the matter regardless of Dr. Nelson's ample research.   We do, however, note a leading insurance treatise's guidance that an insurer may avoid liability if "remuneration from the insured's employment [is] reasonably comparable with that which he or she earned prior to being injured."   10A COUCH ON INSURANCE § 147.26 (3d ed. 2012).   Accordingly, we conclude that the foregoing affidavits may have *some* tendency to prove Dr. Nelson's ability to engage in gainful employment and thus DENY Defendant's Motion to Strike in its entirety.

Nevertheless, although relevant and admissible, these affidavits do not alter the Court's determination regarding Dr. Nelson's disability status.   The significant facts remain unchanged, *i.e.*, Dr. Nelson's maximum former annual income is $229,594, and his present annual income is $185,000.   Notwithstanding a relatively recent blow to his career, Dr. Nelson has returned to practice, earning nearly 81% of his former salary.   His standard of living, while not precisely as affluent as it was before, seems reasonable in light of all of the circumstances.   Of course, implicit in Dr. Nelson's briefing materials is the sense that working as a correctional facility staff physician is somehow less rewarding than practicing anesthesiology.   Lest it appear otherwise, we are mindful that Dr. Nelson's current employment opportunities may not be as financially lucrative or intellectually stimulating (at least not from his perspective) as his former anesthesiology practice.   But

we are equally mindful of the fact that Dr. Nelson's own actions factored substantially into the disruption of his career.   Regrettably, the policy language under consideration does not indicate that the parties intended to indemnify Dr. Nelson's inability to practice pain medicine because of narcotics abuse.   It is sufficient to bar recovery under the general disability provision that Dr. Nelson can (and, indeed, has done so since January 2010) pursue other employment which is, in a fair sense, compensatory.

For each of the foregoing reasons, we conclude that NML's termination of life insurance benefits was not a breach of its contract with Dr. Nelson.   Additionally, the termination of such benefits was not a repudiation of the agreement.   Repudiation does not lie every time an insurer denies coverage, nor where liability is denied following an honest dispute concerning facts.   *See Prudence Life Ins. Co. v. Morgan*, 213 N.E.2d 900, 910-11 (Ind. Ct. App. 1966).   Rather, it occurs when the insurer's "denial of liability . . . amounts to a frustration of the ends it was expected to subserve."   *Colonial Life & Acc. Ins. Co. v. Newman*, 288 N.E.2d 195, 196 (Ind. Ct. App. 1972).   NML's December 20, 2010 letter to Dr. Nelson explaining the termination of the Waiver Benefit was not such a frustration of the Second Policy.   It was certainly not a "positive, absolute, and unconditional" declaration of intent not to perform, as is required for a finding of repudiation.   *Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App. 1991).   The letter simply informed Dr. Nelson that NML no longer found him "totally disabled" under the Second Policy and that Dr. Nelson should resume payment of premiums to maintain coverage. *See* NML Ltr.   Because we do not believe NML's conduct represents a breach of contract,

21

it therefore stands to reason that NML's conduct was also not an anticipatory breach or repudiation of the contract.

## Conclusion

Based on the foregoing analysis, the Court now declares that although Dr. Nelson was occupationally disabled for the first 24 months of the applicable policy period, he was not—and still is not—generally disabled at any point thereafter.   Accordingly, he can no longer rely on the Waiver Benefit, and NML is not liable to Dr. Nelson for having terminated this benefit.   Dr. Nelson must begin paying his premiums under the Second Policy if he wants such policy to remain in force.   If he resumes payment before the Second Policy expires, he will be eligible to apply for the Waiver Benefit in the event that he becomes disabled in the future, provided that he is "disabled" as that term is defined in the Second Policy.   The Court therefore DENIES Plaintiff's Motion for Partial Summary Judgment and, as previously discussed, DENIES Defendant's Motion to Strike. Additionally, the Court GRANTS Defendant's Cross-Motion for Summary Judgment. Summary judgment in this matter is hereby entered in favor of Defendant and against Plaintiff, and final judgment in accordance with this entry will issue.

IT IS SO ORDERED.

Date: _____12/18/2012_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

22

Copies to:


Robert E. Saint
EMSWILLER WILLIAMS NOLAND & CLARKE
rsaint@ewnc-law.com

Curtis T. Jones
BOSE MCKINNEY & EVANS, LLP
cjones@boselaw.com

George E. Purdy
KRIEG DEVAULT LLP
gpurdy@kdlegal.com